**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ABDULLAH WILLIAMSON, | : | HABEAS CORPUS |
| GC No. 896902, | : | 28 U.S.C. § 2254 |
|     Petitioner, | : | |
| | : | |
|     v. | : | CIVIL ACTION NO. |
| | : | 1:11-CV-2668-TWT-ECS |
| CARL HUMPHREY, | : | |
|     Respondent. | : | |

**FINAL REPORT AND RECOMMENDATION**

This matter is before the Court on state inmate Abdullah Williamson's petition for a federal writ of habeas corpus, Warden Carl Humphrey's Answer-Response, and Mr. Williamson's brief in support of his petition. See [Doc. Nos. 1, 5, 7]. For the following reasons, the undersigned **RECOMMENDS** that Mr. Williamson's petition be **DENIED** and that no certificate of appealability be issued.

In 2008, a Fulton County jury convicted Mr. Williamson of two counts of armed robbery, three counts of aggravated assault with a deadly weapon, three counts of possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon, arising out of drug deal turned into robbery, assault and homicide. See Williamson v. State, 708 S.E.2d 57 (Ga. Ct. App. 2011).[1] Mr. Williamson appealed the verdict, arguing, among other

---

[1] The jury deadlocked on one murder and two felony murder counts against Mr. Williamson. Id. at 58 n.1.

things, that the evidence was insufficient to sustain it under Jackson v. Virginia, 443 U.S. 307 (1979)(holding that an applicant relief is entitled to habeas corpus relief if it is found that upon the evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt). See [Doc. No. 9-1 at 8 (citing Jackson v. Virginia)].

The Georgia Court of Appeals affirmed Mr. Williamson's convictions, finding the evidence to be sufficient to support Williamson's conviction beyond a reasonable doubt. See Williamson, 708 S.E.2d at 62, 63. In his federal habeas petition, Williamson again asserts that "the evidence adduced at Petitioner's trial was insufficient to convince a rational trier of fact beyond a reasonable doubt of Petitioner's guilt," [Doc. No. 1 at 5]. Williamson raises no other grounds for relief.

Federal habeas corpus review of state court decisions denying claims on the merits is heavily circumscribed, see 28 U.S.C. § 2254(d). The Supreme Court has recently reemphasized that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state law procedural principles to the contrary," even where the state court's decision "is unaccompanied by an opinion explaining the reasons relief has been denied." Harrington

2

v. Richter, 131 S. Ct. 770, 784-85 (2010).  And, when a claim has
been presumptively adjudicated on the merits, federal habeas relief
may not be granted unless the "state court's decision 'was contrary
to' federal law then clearly established by the holdings of the
[Supreme Court], . . . 'involved an unreasonable application of
such law, [or] 'was based on an unreasonable determination of the
facts' in light of the record before the state court." Id. at 785
(internal citations omitted).  In other words, if a state court has
denied a petitioner's claims on the merits, federal habeas relief
may be granted only where "there was no reasonable basis for the
state court to deny relief." Id. at 784.

      In this case, the Georgia Court of Appeals did not
unreasonably apply Jackson v. Virginia or reach a decision contrary
to it.  Under Jackson v. Virginia, "the relevant question is
whether, after viewing the evidence in the light most favorable to
the prosecution, any rational trier of fact could have found the
essential elements of the crime[s] beyond a reasonable doubt."
Jackson, 443 U.S. at 319 (emphasis in the original).  The Georgia
Court of Appeals recited at length the facts it concluded were
established at trial, finding that the evidence was sufficient.
Williamson, 708 S.E.2d at 62. The Court of Appeals' summary is
reprinted in Appendix A and need not be repeated in full here.  It
is enough to note that Mr. Williamson was identified by two

                                3

eyewitnesses - his co-defendant and one of the robbery victims - as one of two gunmen who held up three victims. Those eyewitness identifications, together with other evidence, were plainly sufficient to allow a rational trier of fact to find proof beyond a reasonable doubt of the essential elements of the crimes for which Mr. Williamson was convicted.[2]

Mr. Williamson contends that the Georgia Court of Appeals' decision rested on "an unreasonable determination of the facts in light of the evidence presented in the state court trial." [Doc. No. 7 at 5]. However, in this federal habeas proceeding, the state courts' determination of factual issues is presumed to be correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). Mr. Williamson has not identified any specific errors in the Georgia Court of Appeals' determination of factual issues, let alone rebutted its determinations with clear and convincing evidence.

---

[2]   Mr. Williamson cites Cosby v. Jones, 682 F.2d 1373 (11th Cir. 1982), see [Doc. No. 7 at 4], in which the Eleventh circuit held that petitioner's possession and pawning of stolen camera a day or two after the burglary, without corroborating evidence of significance, was insufficient to support his Georgia burglary conviction. Id. at 1383. Cosby, however, does not help Petitioner. First, Cosby is not a Supreme Court decision on point. Second, the facts in Cosby are easily distinguishable, as the conviction in that case was based on an inference drawn from possession of stolen goods, without the significant corroborating eye witness evidence present in Williamson's case.

The undersigned therefore **RECOMMENDS** that Mr. Williamson's federal habeas petition be **DENIED**.

The undersigned further **RECOMMENDS** that a certificate of appealability be **DENIED** because Mr. Williamson has not made the requisite showing.  <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 478 (2000).

The Clerk is **DIRECTED** to terminate the referral of this case to the undersigned.

**SO RECOMMENDED AND DIRECTED,** this 5th day of December, 2013.


*<u>S/ E. Clayton Scofield III</u>*
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

5

## APPENDIX A

Viewed in the light most favorable to the verdict, the evidence at trial showed that on or about September 7, 2006, Ardis Toney, Michael Buchanan, and Jovan Priest, all members of a rap group known as "Three Kings," were in Atlanta to promote their CD. They were driving a black Cadillac and were planning to purchase ten to thirteen pounds of marijuana. The three met a "middleman" named "Tay," at a gas station. Tay arrived at the station driving a gray Ford Focus. Buchanan got into the Focus with Tay and they drove away, followed by Toney and Priest in the Cadillac. Two men in a red Ford Mustang pulled up beside the Cadillac. Toney, who was driving the Cadillac, believed that these were the men with the marijuana, so he allowed the Mustang to get in front of him and he continued to follow. The Focus turned into a driveway and the Mustang pulled in next; Toney pulled the Cadillac in behind the Mustang.

When the cars stopped, the driver of the Mustang got out of the car and walked right in front of the Cadillac toward the Focus with a bag of marijuana, presumably to show Buchanan. The driver then walked back in front of the Cadillac to return to the Mustang. Toney could not see the driver well until the driver got out of the Mustang and walked in front of the Cadillac. He explained that this meeting took place around 6:00 or 7:00 p.m., and it was still light outside. He said that the driver of the Mustang was wearing green and also wore sunglasses and a hat over his "low cut" hairstyle. The other man had dreadlocks and wore a white shirt and an Atlanta Braves hat. Toney identified Williamson at trial as the man without the dreadlocks and as the driver of the Mustang.

Buchanan then got out of the Focus and into the passenger side of the Mustang beside Williamson, who had returned to the car. Toney testified that neither Buchanan, Priest, nor he had a gun that day. Buchanan had $3,000 to $5,000 in his pocket, and they had $10,000 in a red box inside the Cadillac. Buchanan and the driver spoke for a few minutes, and then Buchanan got out of the car and walked toward the Cadillac. The man with the dreadlocks walked to the car with him, and Buchanan showed the man the $10,000 in the box. Buchanan returned to the Mustang and within 30 seconds, Toney heard a gunshot, which he said "had to be inside the car." Toney was sure that Tay had not been the one to fire the shot. Buchanan jumped out of the car and ran past the Cadillac where he collapsed on the ground. The driver then got out of the Mustang, walked to

6

the Cadillac and pointed a gun at Toney and Priest. Buchanan yelled at Toney and Priest to give him the $10,000. Toney passed the money to Priest who threw it out the window toward the man with the white shirt and the dreadlocks. Williamson and the man with the dreadlocks jumped in the Mustang and drove off. Toney and Priest then put Buchanan in the car and started to follow Tay to the hospital, but they were intercepted by the police, who summoned an ambulance. Buchanan later died from his injuries.

Toney and Priest subsequently picked Octavian Dwight out of a line-up and identified him as Tay, the middleman who set up the drug deal. But seven days after this incident, police showed Toney and Priest a six-photograph line-up that included a photograph of Williamson. Neither Toney nor Priest was able to pick Williamson out of the line-up. Toney testified that he looked at the driver again briefly for about five seconds when he was pointing the gun at him. When Williamson's counsel asked Toney whether he could tell the jury beyond a reasonable doubt that Williamson was the man driving the Mustang that day, Toney replied, "He didn't have hair like that. He had a hat on, and had some shades on, but he resembles him very much so." He went on to say, however, that he could "assume" that it was Williamson because he was sitting at the defense table. But when Williamson's attorney again pressed him on his identification, Toney stated, "Totally honest, he looks like him, yeah."

Jovan Priest also testified that the Mustang's driver got out of the car to show Buchanan some marijuana, but he did not get a good look at him. Buchanan was alone in the Mustang with the driver at the time the shot was fired. He saw Buchanan run from the car, and both the driver and the Mustang passenger, who had dreadlocks, pointed guns at Toney and Priest. Priest threw the red box with the money out of the car toward the man with the dreadlocks. He said that he made no eye contact with the men.

Fernando Cannon, Williamson's co-defendant in the case, pled guilty the day before Williamson's trial to charges of armed robbery and possession of a firearm during the commission of a felony. He was sentenced to 20 years to serve. When the State called Cannon as a witness at Williamson's trial, he said that he had been "misguided" by his counsel and asked for a new attorney. Cannon said that he did not want to testify, and the trial court allowed the State to treat him as a hostile witness. The court also allowed Cannon five minutes to confer with counsel.

After testimony resumed, Cannon stated that he was involved in a drug deal with Octavian "Tay" Dwight on September 7, 2006 involving the sale of 13 pounds of marijuana. He admitted that he had said in court the day before that Williamson, Buchanan, Toney and Priest were also involved in the transaction. Cannon admitted saying that he was in the Mustang with Williamson that day; Tay was in a Ford Focus and the others were in a Cadillac. Cannon said that he was not in the Mustang at the time Buchanan was shot but rather got out of the car and went to the Ford Focus. He heard some arguing at the time Buchanan was in the Mustang. Although Cannon was extremely reluctant to respond to any questions involving Williamson, he confirmed that he had said at his plea hearing that only Williamson and Buchanan were in the Mustang at the time of the shooting, although he did not see the shooting occur. At the time of the shooting, Cannon was in the Focus with Tay, and Priest and Toney were in the Cadillac. Although Cannon apparently stated at the plea hearing that the shot came from inside the car, he testified at trial that he did not know where the shot came from.

After the shot rang out, Tay got out of the car and ran down the street. Cannon grabbed a gun from inside the Focus and got out of the car. He walked over to the Cadillac and pointed the gun at Priest and Toney. He acknowledged telling prosecutors the day before that Priest and Toney had thrown a red box out of the window of the Cadillac, but he refused to answer the prosecutor's questions as to whether he got in the car with Williamson and drove away. Nevertheless, he admitted later that after the shooting he was dropped off "at the top of the street" where he got out of the Mustang. The driver of the Mustang drove off. Cannon said that he never drove the Mustang. At that point, Cannon ran home, out of breath, where he told his wife that he had heard a shot and he ran. He recalled her asking whether Williamson had shot somebody and he told her that he did not know.

On cross-examination, Cannon testified that he rode to the gas station that day with Tay in the Ford Focus where he saw the Cadillac with the men he later came to identify as Tony, Priest and Buchanan. Cannon went inside the gas station, and as he came out, he saw Buchanan get in the Ford Focus and one of the Cadillac passengers move to the Cadillac's driver's seat. The prosecutor then asked Cannon whether it was true that Williamson "was not at that scene" (emphasis supplied), and Cannon answered, "Correct." But Cannon refused to respond when the defense attorney asked him to state that Williamson was not involved in the drug deal. And although Cannon testified that he did not see Williamson shoot anyone and did not even see him with a gun, he refused to respond

8

when counsel asked him to state that Williamson was not at the scene of the shooting.

On re-direct, Cannon stated that after he had entered his guilty plea the day before, he had been attacked and almost stabbed that night in the Fulton County Jail. Cannon stated that he was quiet in response to any questions about Williamson because he did not want to testify against him. On re-cross, he clarified that the men who jumped him called him a "snitch on [Williamson]."

Bernithia Young, Cannon's wife, also reluctantly testified at Williamson's trial. Young stated that a man she believed to be Williamson called her the night before the trial and she got the impression from that conversation that if her husband testified against Williamson something would happen to her husband. Nevertheless, Young testified that Cannon came home on the day of the shooting breathing hard and panicking. She asked him what was wrong. He said that he thought someone had been shot. Cannon said that he had been in a car with Williamson and he thought Williamson had shot the person.

Larry Humphrey testified that he lived near the crime scene, and on the evening in question, he heard a gunshot as he was outside his house. When he ran around to the front to see what had happened, he observed two men standing up; one was hopping around. The other man, who had dreadlocks was saying, "Where the money, where the money?" At that point Humphrey went back inside to get a gun. When he re-emerged, he saw the man in dreadlocks get into the passenger side of the Mustang and the car drove off. He saw another man running away up the street, who later came back. He had heard a lady across the street holler and he believed that scared the men away. Humphrey and his partner then approached the Cadillac and asked if they needed paramedics, but the men in the car said that they would drive the injured man to the hospital.

Shirley Ashanti, another nearby resident, testified that she was inside her house on the phone when she heard cars screeching and loud arguing. She then heard a gunshot and looked out her window. Ashanti saw three cars, including a red sports car. She saw a person on the ground, bleeding who was trying to get up and run, and she saw a man with a cap holding a gun coming from the driver's side of the red car. She said it looked like smoke was coming out of the gun and that he was coming around the car to shoot the person again. Before she knew it, she was outside yelling at him not to shoot anymore.

9

Detective  D.  R.  Dumas  of  the  Atlanta  Police  Department
testified  that  he  processed  the  crime  scene  in  this  case.  He
testified  that  a  search  of  the  scene  revealed  a  small  red  box  and
a  substance  that  looked  like  compressed  marijuana  but  that  Dumas
believed  it  to  be  counterfeit  because  it  did  not  have  the  strong
pungent  odor  usually  associated  with  the  drug.  Police  also  found  a
cigarette  butt,  an  unfired  cartridge  and  blood  stains.

<u>Williamson v. State</u>, 708 S.E.2d 57, 58-61 (Ga. Ct. App. 2011).

AO 72A
(Rev.8/82)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ABDULLAH WILLIAMSON,          :          HABEAS CORPUS
GC No. 896902,                :          28 U.S.C. § 2254
     Petitioner,            :
                                     :
     v.                     :          CIVIL ACTION NO.
                                       :          1:11-CV-2668-TWT-ECS
CARL HUMPHREY,                :
     Respondent.            :

**ORDER FOR SERVICE OF REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

Attached is the report and recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Civil Local Rule 72. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within fourteen (14) days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be

limited to a plain error review.  <u>United States v. Slay</u>, 714 F.2d 1093 (11th Cir. 1983).

The Clerk is **DIRECTED** to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED,** this 5th day of December, 2013.

<u>***S/ E. Clayton Scofield III***</u>
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

2